# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**DUANE RAY,**

      **Plaintiff,**

          **Case No. 1:21-cv-76**

    **v.**          **JUDGE DOUGLAS R. COLE**

**FIFTH THIRD BANK, N.A., et al.,**

      **Defendants.**

## <u>OPINION AND ORDER</u>

Defendant Foundation Risk Partners ("FRP") moves for a preliminary injunction (Doc. 37) to enforce a restrictive covenant that, according to FRP, applies to Plaintiff Duane Ray, a former employee of another defendant. Four settled principles of law control the Court's decision. First, a preliminary injunction is a drastic remedy, and the party seeking it carries a heavy burden. Second, courts must treat separate corporations as distinct entities, even when one such corporation is a wholly-owned subsidiary of another. Third, courts must enforce contracts according to their plain language. And fourth, restrictive covenants, especially those contained in employment agreements, are disfavored, and accordingly courts will construe any ambiguity both (1) in favor of narrow application, and (2) against the drafter. Applying those four principles to the facts here, the Court concludes that it must **DENY** FRP's requested preliminary injunction (Doc. 37).

## FACTUAL BACKGROUND

The Court has previously addressed the factual underpinnings of the business transaction giving rise to the instant dispute in its recent decision in *Hobbs v. Fifth Third Bank, N.A.*, No. 1:20-cv-1040, 2021 WL 5577406 (S.D. Ohio Nov. 29, 2021). That case, like this case, involves a former employee of Fifth Third Insurance (there Hobbs, here Ray), against whom Foundation Risk Partners (who acquired the Fifth Third Insurance business) is seeking to enforce a restrictive covenant. (The former employees are the plaintiffs in both actions because they filed for declaratory relief, asserting that the restrictive covenant at issue is not valid or enforceable.) Thus, the Court will keep its description of the underlying business transaction in this Opinion short and refer those wishing greater detail regarding that transaction to the previous Opinion. *See id.* at *1–4.

Fifth Third Insurance ("FTI") is a wholly-owned subsidiary of Fifth Third Bank, N.A. (the "Bank"). The Bank, through FTI, purchased an insurance business from Epic Insurance Solutions LLC ("Epic") in late 2017. As part of the 2017 transaction between FTI and Epic, the Bank offered jobs to the insurance brokers who had been employed at Epic, including Ray. (*See* 9/25/17 Offer Ltr., Am. Compl. Ex. 1, Doc. 22-1). Unfortunately, as is the case with some of the other key documents here, the exact identity of Ray's new employer is a little murky. The offer letter is on Fifth Third Bank letterhead, but it purports to offer Ray employment with "Epic Insurance Solutions Agency LLC,[1] which, following its acquisition by Fifth Third

---

[1] Despite the similar name, this is a different entity from Epic Insurance Solutions LLC.

Insurance Agency, Inc., will become an indirectly wholly-owned subsidiary of Fifth Third Bancorp (collectively 'Fifth Third')." (*Id.* at #167). But the letter goes on to note that "*the Bank* offers employees" certain benefits, instructs Ray that any questions should go to *the Bank's* human resources department, and states that Ray will be "accepting this offer of employment with Fifth Third," i.e., the collective entity that includes Epic Insurance Solutions Agency LLC, FTI, and Fifth Third Bancorp. (*See id.* at #168–71).

In any event, the compensation that "Fifth Third" offered each prospective employee included a grant of Fifth Third Bancorp stock (the amount varied depending on the employee) subject to a three-year cliff vesting period. More specifically, the employee would vest in the stock if he or she remained employed at "Fifth Third" on the first day of the first full quarter that occurred more than three years after the deal closed. (*Id.* at #167). (As the deal closed in November 2017, the vesting date was January 1, 2021.) Fifth Third offered Ray $15,000 in such stock, subject to Board of Director approval. (*Id.*).

The transaction between Epic and the Bank also involved the assignment of certain restrictive covenants that had applied to the brokers when they worked at Epic. Importantly for present purposes, though, at the evidentiary hearing FRP specifically disclaimed any reliance on those restrictive covenants as a basis for the relief it seeks. Thus, the Court need not consider the impact, if any, of those restrictive covenants, and will not discuss them further here.

The Bank, however, also imposed its own restrictive covenant (or, technically, a restrictive covenant subject to yearly renewal) on Ray in connection with his employment there. And that restrictive covenant *is* relevant here. The Bank accomplished this objective through an annual Incentive Compensation Program ("ICP") for its employees. Every year, the Bank announced a new ICP, and every year Ray (and others), would electronically signify their acceptance of that ICP (i.e., use a mouse to click a button on their computer screen).

The 2020 ICP (the ICP relevant here) is between the "Participant" and "Fifth Third Bank, National Association (including its parent companies, subsidiaries, and affiliates, collectively 'Fifth Third,' the 'Bank,' or 'Employer')" (2020 ICP, Pl. Hr'g Ex. 7, at 1). The restrictive covenant appears in Section V of the document. It provides that, in exchange for "the benefits that the Participant receives under this Plan, the Bank's providing Participants with portions of its Confidential Information … and access to customers and customer goodwill, and continued employment," that "for a period of two [] years after the Termination of Employment, regardless of the reason for the termination," the Participant will not engage in certain activities. (*Id.* at 11). As relevant here, the Participant (1) will not solicit any "customers with whom Participant had contact … during the last two [] years of employment with Fifth Third," and (2) will not "[a]ccept business or orders" from such customers as to "products or services competitive with those products and services as to which Participant had material involvement …." (*Id.*).

4

The 2020 ICP also separately addressed the extent to which "rights and obligations" under the ICP could be assigned. In particular, Section IX, labeled "Miscellaneous Provisions," includes the following:

> Participant may not assign or otherwise transfer Participant's rights, obligations, or duties contained in this Plan. Fifth Third retains the right without further notice or consent to assign its rights and obligations under the Plan *to any successor in interest or purchaser of substantially all of Fifth Third's assets*. In the event of such an assignment, the benefits and burdens of this Plan shall inure to the benefit of and is [*sic*] binding upon the successor or assignee of Fifth Third.

(*Id.* at 15 (emphasis added)).

The final contract relevant to the current dispute is an Asset Purchase Agreement ("APA") between (as relevant here) FTI and Epic Insurance Solutions Agency LLC ("Epic Agency") (collectively the "Selling Parties") and FRP (the "Buyer"). The agreement is dated December 4, 2020, and called for the closing to occur at 11:59 p.m. on December 31, 2020 (i.e., one minute before the stock grants referred to above were set to vest). (*See* APA, §§ 1.08, 1.18).[2] The basic structure of the deal was that the Selling Parties (i.e., FTI and Epic Agency) would sell all or substantially all of their assets to the Buyer. Because FTI was the sole member of Epic Agency, one of FTI's assets was its sole membership interest in Epic Agency. Thus, as a result of the transaction, Buyer purchased not only all of the assets of the two entities, but also acquired the Epic Agency entity itself. And, important here, the assets that the

---

[2] Although the APA was not admitted as physical evidence during the Preliminary Injunction hearing, the parties stipulated to its authenticity and admissibility, and agreed that counsel would email a copy of the APA and associated attachments to chambers after the hearing for inclusion in the record, which counsel then did. (*See* 02/11/2022 Minute Entry).

Selling Parties transferred included "all rights of Selling Parties under any non-competition, non-solicitation, non-piracy, or other restrictive covenant in favor of a Selling Party …." (*Id.* at § 2.01(c)).

In connection with the sale, the Selling Parties provided a list of employees who were working in the insurance business. (Disclosure Schedule, APA Schedule 1.64). The list identified 79 such employees, including Duane Ray (and Myron Hobbs, the plaintiff in the other lawsuit mentioned above). (*Id.*). The APA contemplated that each listed employee (who the APA referred to as "Transferred Employees") would accept a job offer with FRP pursuant to employment agreements with FRP that included restrictive covenants. (*See* APA §§ 1.64 (noting "Transferred Employees" will sign "Employment Agreements"), 3.04(b) (defining "Employment Agreements" to include a restrictive covenant)).

Because the closing was set to occur in advance of the stock grant vesting date (by one minute), Fifth Third's view was that it had no obligation to fulfill the previous stock grants it had awarded to the Epic employees who joined "Fifth Third" in connection with Fifth Third's earlier purchase of Epic. To sweeten the pot on the FRP employment offer, though, Fifth Third told Ray that, if he accepted the FRP employment contract, and also signed a general release—whereby he would broadly release any and all claims that he may have against Fifth Third—Fifth Third would pay him a lump sum of $10,000, which was $5,000 less than the previously promised stock grant. (*See* General Release of All Claims, Am. Compl. Ex. 6, Doc. 22-6, #210).

Ray (and Hobbs) declined to accept the FRP employment offer and refused to sign Fifth Third's proposed release. When Fifth Third learned in late December that Ray would not accept the FRP offer, and thus would not become an FRP employee upon closing, Fifth Third terminated Ray's employment. As a result, Fifth Third did not employ Ray as of the stock vesting date, and in turn did not grant him the promised stock, or pay the monetary equivalent.[3]

Instead of joining FRP, Ray ventured off on his own to sell insurance, apparently under the name of Big4 Insurance Agency. (*See* Big4 Ins. Announcement, FRP Post-Hr'g Br. Ex. 3, Doc. 62-3, #965). In doing so, it is undisputed that Ray contacted customers who he had serviced through FTI. By early fall of 2021, he had obtained business from sixteen such clients. (*See* Customer List, FRP Post-Hr'g Br. Ex. 4, Doc. 62-4, #966–68 (identifying sixteen clients in column four)).

FRP maintains that Ray's activities violate restrictive covenants that FRP has a right to enforce. After FRP raised its concerns to Ray, Ray responded by filing this lawsuit seeking declaratory and injunctive relief relating to the 2020 ICP. (*See* Am. Compl., Doc. 22). In particular, Ray claimed that Fifth Third had materially breached that agreement, rendering any restrictive covenant therein unenforceable. (*Id*. at #132). Separately, Ray maintains that Fifth Third did not validly assign the restrictive covenants under the 2020 ICP to FRP, meaning that FRP has no standing to enforce those covenants. (*Id*.).

---

[3] The Selling Parties and FRP also amended the APA such that "neither Walker, nor Duane Ray, nor Myron Hobbs is required to execute an Employment Agreement or accept employment with Buyer on or after the Closing Date as a condition precedent to the Closing." (*See* First Amendment to Asset Purchase Agreement, at 2 (Dec. 31, 2020)).

On October 7, 2021, the parties entered an agreed temporary restraining order ("TRO"). (Doc. 44). That TRO provided that Ray could continue to service the sixteen clients he had obtained as of September 2, 2021, but that Ray could not solicit or accept any other former customers. (*Id.* at #611). The TRO further required FRP to post a surety bond in the amount of $25,000. (*Id.*). Under the terms of the original TRO, that prohibition would remain in place through a hearing on the instant motion for preliminary injunction, which was then scheduled for December 1–2, 2021. (*Id.* at #610). When the Court continued the hearing date, the parties entered an Amended Agreed TRO extending the date through the new hearing date, which at that point was yet undetermined (*see* Doc. 47), and increasing the surety bond to $50,000 (*see* Doc. 52; Doc. 53), which Defendants posted.

On February 11, 2022, the Court held an evidentiary hearing. On February 18, 2022, the parties cross-filed post-hearing briefs. (Docs. 60, 62, 63). The matter is now before the Court.

## LAW AND ANALYSIS

"The party seeking the preliminary injunction bears the burden of justifying such relief." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). And this is a heavy burden. As the Sixth Circuit has observed more than once, "preliminary injunctions are 'extraordinary and drastic remed[ies] … never awarded as of right." *Platt v. Bd. of Comm'rs on Grievances and Discipline of Ohio Supreme Court*, 769 F.3d 447, 453 (6th Cir. 2014) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)); *Am. Civ. Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015)

8

(same). Rather, such relief "should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *see also Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (noting that a "preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it'") (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991)) (brackets and internal quotation omitted).

The Court considers four factors in deciding whether to issue a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019). No one factor is determinative, rather, the Court should "balance[] [the factors] against each other." *Overstreet*, 305 F.3d at 573 (citing *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998)). That said, a finding that there is no likelihood of success on the merits tips that balance in such a way that is "usually fatal" to the request for a preliminary injunction. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)). The Court considers each of those factors in turn.

**A.    FRP Has Not Provided Sufficient Evidence To Conclude That FRP Has A Strong Likelihood Of Success On The Merits.**

To satisfy the first prong, a movant must "show[] a strong or substantial likelihood or probability of success on the merits." *Bossert v. Springfield Grp., Inc.*, 579 F. Supp. 56, 66 (S.D. Ohio 1984); *Warner v. Cent. Tr. Co.*, 715 F.2d 1121, 1124 (6th Cir. 1983) ("Since the district court did not find that appellant had shown a strong or substantial likelihood that he could prove fraud in the transaction which produced the letter of credit, the first 'prong' of the traditional test for a preliminary injunction has not been met."). Let's start with the easy part—if the restrictive covenant from the 2020 ICP applies to Ray, the overwhelming evidence shows that he violated it. Indeed, he concedes as much. Thus, the likelihood-of-success-on-the-merits prong comes down to whether FRP validly acquired the right to enforce that covenant against Ray. On that issue, the Court concludes that FRP has failed to establish a strong likelihood of success.

Understanding why that is so requires a close reading of the two key contracts at issue: (1) the 2020 ICP, which creates the restrictive covenant in Fifth Third's favor in the first instance, and (2) the 2020 APA, which is the mechanism by which Fifth Third (or, more accurately, FTI and Epic Agency) assigned certain contractual rights to FRP. In particular, analyzing the Defendants' likelihood of success requires careful attention to exactly which entities are parties to each of these agreements, to exactly what assignability rights the 2020 ICP creates, and to exactly what rights the 2020 APA assigns. And, in undertaking this interpretive task, the Court starts from the well-settled proposition under Ohio law that courts must "presume that the intent of

10

the parties is reflected in the plain language of the contract." *Beverage Holdings, LLC v. 5701 Lombardo, LLC*, 150 N.E.3d 28, 31 (Ohio 2019).[4]

What creates much of the confusion is that Fifth Third (or FTI, or Epic Agency) apparently was not always careful in specifying which Fifth Third entity (or entities) was a party (or parties) to a particular contract. That matters, because "[g]enerally, a parent and subsidiary are separate and distinct legal entities" under Ohio law. *Mut. Holding Co. v. Limbach*, 641 N.E.2d 1080, 1081 (Ohio 1994). Thus, each separate entity must establish its own right to enforce a contract. Where the drafter does not carefully address that issue, though, things can get confusing quickly.

For example, look at the initial offer letter to Ray. At points, that offer letter appears to suggest that Ray will be an employee of Epic Agency, which will be a subsidiary of FTI, which in turn is a subsidiary of the Bank. (*See* Pl. Hr'g Ex. 2). But, at other points, it appears that it is Fifth Third itself, i.e., the Bank, that is the counterparty to the offer letter. Indeed, it appears that FRP understands the offer letter in this latter way—its argument with respect to the promise of a $15,000 stock grant is that any such promise bound only Fifth Third (the Bank), and not FTI, such that any failure to perform that promise does not interfere with FTI's right to enforce the restrictive covenant. (*See* FRP Post-Hr'g Br., Doc. 62, #883–84). But FTI cannot rely on corporate separateness only when that separateness redounds to FTI's benefit. If FTI is a party to the contract (as part of some collective "Fifth Third"

---

[4] The two contracts both include choice of law provisions indicating that Ohio law applies.

entity), then "Fifth Third's" failure to make good on its promises would extend to FTI, as well.

Of course, the key contract here is the 2020 ICP, which contains the restrictive covenant that FRP claims it acquired (through the APA), and now seeks to enforce. What does that contract have to say about who the parties to that agreement are? According to the document, it purports to "set[] forth each covered Participant's agreement *with Fifth Third* regarding incentive compensation and other matters." (Pl. Hr'g Ex. 7, § I (emphasis added)). To be sure, the agreement defines Fifth Third to mean "Fifth Third Bank, National Association (including its parent companies, subsidiaries and affiliates, collectively 'Fifth Third,' the 'Bank,' or 'Employer')." (*Id.*). But even that makes it appear that the contract runs principally to the collective entity *as a whole*, rather than to any particular subsidiary or affiliate.

Why does that matter? Ohio law provides that restrictive covenants are assignable. *Rogers v. Runfola & Assocs., Inc.*, 565 N.E.2d 540, 543 (1991). Indeed, as FRP notes, that is the default rule. *See Artromick Internatl., Inc. v. Koch*, 759 N.E.2d 385, 387 (Ohio Ct. App. 2001); *Safier's, Inc., v. Biale*r, 93 N.E.2d 734, 739 (Ohio Com. Pl. 1950). So, if a contract that contains a restrictive covenant says nothing about the assignability of that covenant, the presumption would be that it is assignable. *Artromick*, 759 N.E.2d at 387 ("Ohio case law … appears to … allow[] assignment of covenants not to compete without specific provisions for their assignability."). The ICP, though—which, it bears noting, Fifth Third drafted—expressly addresses assignability. And, as noted above, the contract's plain language makes the covenant

12

assignable "to any successor in interest or purchaser of substantially all of *Fifth Third's* assets." (2020 ICP, Pl. Hr'g Ex. 7, at 15). But if, as Fifth Third and FRP maintain, "Fifth Third" refers to the collective entity comprised of Fifth Third and all its subsidiaries and affiliates, it is undisputed that the APA did not involve the sale of "substantially all of Fifth Third's assets." Indeed, Fifth Third and FRP concede that point.

They offer two responses, though, neither of which the Court finds convincing. First, they suggest that the Court rely on the default rule of assignability, rather than the contract language addressing that topic. But default rules apply only to the extent that parties do not *change* the default rules in their actual agreement. Here, the parties did. If the parties intended the default rule to apply (i.e., that Fifth Third could assign the covenant at will), then why would they include one specific instance in which the covenant is assignable (i.e., upon the sale of substantially all of Fifth Third's assets)? In short, it makes no sense to assume that a contract includes rules providing that both (1) the covenant is always assignable (i.e., the alleged default rule), and (2) the covenant is assignable in one certain circumstance (i.e., the expressly included rule). To the contrary, under basic principles of contract law, the express inclusion of the latter negates the tacit inclusion of the former. *See, e.g., Largo Legacy Grp., LLC v. Charles*, No. CV 2020-0105-MTZ, 2021 WL 2692426, at *15 (Del. Ch. June 30, 2021) ("When parties cover a particular subject in an express manner, their contractual choice governs and cannot be supplanted by the application of inconsistent fiduciary duty principles that might otherwise apply as a default.")

13

(quotation omitted); *cf. ISHA, Inc. v. Risser*, No. 1-12-47, 2013 WL 2316248, at *7 (Ohio Ct. App., May 28, 2013) (noting that "parties are free to change the default rule by contract"). Accordingly, Defendants cannot rely on the default rule to escape the contractual language that Fifth Third drafted here.

Undeterred, Fifth Third and FRP separately maintain that the express language *does* allow for assignability on the facts here. They make two related arguments in that regard. First, because the collective entity "Fifth Third" includes each of Fifth Third's affiliates or subsidiaries, they insist that the reference to the sale of "substantially all of Fifth Third's assets" likewise should be understood to include the sale of substantially all the assets of *any one or more* of Fifth Third's affiliates or subsidiaries. (FRP Post-Hr'g Br., Doc. 62, #889). That argument is easily disposed of. Courts do not interpret contracts to yield absurd results. Indeed, courts hesitate to adopt such a result even when a contract's plain language seems to compel that answer. *Cheatham I.R.A. v. Huntington Nat'l Bank*, 137 N.E.3d 45, 54 (Ohio 2019) (contractual language is given its "plain and ordinary meaning unless … the result is manifestly absurd") (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146 (1978) (syllabus)). Thus, courts necessarily would not construe ambiguous language to *create* such a result. Yet, the reading that Defendants advance here, where "substantially all of the assets" applies to any subsidiary, would permit Fifth Third to transfer the covenants in connection with the sale of some subsidiary or affiliate that had *nothing* to do with insurance. As the Defendants largely conceded during the hearing, that result would be absurd. And yet that absurd possibility

14

ineluctably follows from Defendants' Fifth-Third-means-any-Fifth-Third-affiliate-or-subsidiary logic.

That leaves their other argument. They contend that, in context here, the parties to the ICP should have understood "sale of substantially all of the assets of Fifth Third" to mean, "of the Fifth Third entity at which you work." They note, for example, that the title of Ray's ICP includes reference to FTI. (*See, e.g.*, Fifth Third Post-Hr'g Br., Doc. 63, #990–91). That is perhaps a closer call. At some level, after all, one could understand why Fifth Third (i.e., the parent entity) would want to be able to transfer restrictive covenants relating to insurance salespeople in connection with the sale of its insurance business. But if that is what the parties meant, they certainly did not say it clearly. For example, even if one understands the assignability provision to mean the covenant is assignable upon transfer of the assets of the affiliate at which an employee works (which is what Fifth Third seems to argue now), that understanding only gives way to an underlying ambiguity: that is, as noted above, there is at least some confusion surrounding exactly which corporate entity extended the employment offer to Ray. Indeed, further compounding the confusion, the testimony at the hearing indicated that Ray's paychecks came from "Fifth Third"— i.e., the Bank. And to the extent that the defendants are arguing that the passing reference to FTI in the title of the document somehow supersedes the plain language of the provision itself, the Court rejects that argument, at least for present purposes. To be sure, it would have been straightforward to draft the ICP language to expressly say what Defendants now contend it means. In fact, FRP offers an example of how

one could do so in its brief—substituting "sale of substantially all of [FTI's] assets" in lieu of "Fifth Third's assets" in the ICP's text. (*Compare* Mem. in Supp. of Mot. for Prelim. Inj., Doc. 37, #506, *with* 2020 ICP, Pl. Hr'g Ex. 7, at 15). But that is not what the operative agreement in fact says.

Finally, FRP asserts that "the law permits a parent and a subsidiary to enforce a restrictive covenant, like the one included in the 2020 IP," (FRP Post-Hr'g Br., Doc. 62, #888), a proposition FRP claims to find in *Masco Cabinetry Middlefield, LLC v. Cefla N. Am., Inc.*, 637 F. App'x192, 201 (6th Cir. 2005). But, as this Court noted in rejecting that same argument in *Hobbs*, "the authorities that Defendants cite do not support the fungible view of corporate identities that Defendants advocate." To be sure, in *Masco*, "the Sixth Circuit … held that both a parent and subsidiary could assert a two-year contractual limitations period even where the parent company was not an explicit party to the contract." *Hobbs*, 2021 WL 5577406, at *7. But, as this Court also noted, "that case considered whether 'separate corporate existence should be disregarded in relation to contractual responsibilities [] because the subsidiary acted as mere instrumentality or adjunct of the parent' in entering the contract." *Id.* (citing *Masco*, 637 F. App'x at 201) (quotations omitted). Here, as in *Hobbs*, there is no indication that the Bank was acting as a "mere instrumentality" of FTI in entering the 2020 ICP.

When all is said and done, at least for current purposes, the best one could say is that the 2020 ICP is ambiguous regarding assignability. But that leads to additional problems for Defendants. In the face of contractual ambiguity, the Court

is to consider extrinsic evidence of the parties' meaning. *Campbell v. 1 Spring, LLC*, No. 18AP-94, 2019 WL 852115, at *3 (Ohio Ct. App. Feb. 21, 2019) ("[W]hen the language of a contract is unclear or ambiguous … extrinsic evidence can be used to ascertain the intent of the parties." (quoting *Drs. Kristal & Forche, D.D.S., Inc. v. Erkis*, No. 09AP-06, 2009 WL 3465916, at *4 (Ohio Ct. App. Oct. 27 2009))). But here, both Ray's supervisor at FTI, and Ray himself, testified that they had not given any thought to the assignability provision. Indeed, they both frankly admitted that they had nothing to do with drafting or negotiating any of the language in the ICP.

That brings some other rules into play. First, as a general matter, courts construe residual ambiguity (i.e., ambiguity remaining after considering any available extrinsic evidence) against the drafter. *LublinSussman Grp. LLP v. Lee*, 107 N.E.3d 724, 729 (Ohio Ct. App 2018) (citing *Reida v. Thermal Seal*, No. 02AP-308, 2002 WL 31819831, at *3 (Ohio Ct. App Dec. 17, 2002)). Here, as noted, all agree that the drafter is Fifth Third, the Bank.

Second, the rule regarding ambiguity takes on special significance in the context of covenants not to compete. At common law, courts typically declined to enforce such provisions at all, or at least understood them very narrowly, as such provisions were deemed a "restraint on trade." *Ohio Urology, Inc. v. Poll*, 594 N.E.2d 1027, 1031 (Ohio Ct. App. 1991) ("Traditionally, agreements not to compete were viewed as restraints of trade and, therefore, were held invalid …."). To be sure, Ohio law now enforces such agreements, assuming certain circumstances are met. *See*

17

*Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975). But even so, Ohio courts continue to cast a chary eye.

That is especially true with regard to such covenants in employment agreements, as opposed to those entered in connection with the sale of a business. *See Century Bus. Servs., Inc. v. Urb.*, 900 N.E.2d 1048, 1054 (Ohio Ct. App. 2008) ("[G]enerally, restrictive covenants in employment agreements have been disfavored by courts …."). When selling a business, of course, the seller typically has received, as part of the sale price, the present value of the future goodwill the seller is transferring. And, in such cases, courts recognize that it would be inequitable to allow the seller to obtain that value in the course of the sale, and then seek to recapture that value (and therefore deprive the buyer of it), by competing down the road. Accordingly, courts are more willing to enforce such covenants when they form part of the consideration in the sale of the restricted person's business. *See, e.g.*, *Blakeman's Valley Off. Equip., Inc. v. Bierdeman*, 786 N.E.2d 914, 919 (Ohio Ct. App. 2003) ("We must note that the matter before us does not involve the typical scenario of a sophisticated employer attempting to enforce a noncompetition clause against an unsophisticated employee. *The clause at issue in this case was bargained for between two businesses, not between an employer and an employee. The covenant formed part of the consideration in the sale of appellee's business to appellant.*") (emphasis added).

But that concern does not arise in the "typical scenario," *see id.*, in play here, where an employer is seeking to enforce a covenant against an employee (rather than against a business seller, who may also be an employee). As to *that* form of restrictive

18

covenant, Ohio law is clear: "[c]ovenants not to compete should in general be strictly construed, since such covenants are normally written by the employer and are in restraint of trade and the right to a livelihood." *Gen. Med., P.C. v. Manolache*, No. 88809, 2007 WL 2325829, at *1 (Ohio Ct. App. Aug. 16, 2007); *see also, e.g.*, *Darrow v. Kolczun*, No. 90CA4759, 1991 WL 35120, at *2 (Ohio Ct. App. Mar. 6, 1991) (same); *Avki v. Avery*, No. 13504, 1993 WL 187923, at *2 (Ohio Ct. App. June 3, 1993) (noting that restrictive covenants in employment agreements "are generally not favored in the law and are strictly construed against enforcement"). Accordingly, "the burden is on the former employer to prove that the restraint is reasonable and the agreement is valid." *See, e.g.*, *J&B Fleet Indus. Supply v. Miller*, No. 09MA173, 2011 WL 2536668, at *14 (Ohio Ct. App. June 16, 2011).

As a result, to ultimately prevail here, FRP would be required first to show that it validly holds (or at least has the right to enforce) the covenant, with all ambiguity on that front construed against it, and then must show that the provision, as written, is enforceable under the nine-factor test that *Raimonde* adopts. Accordingly, to establish it is entitled to the injunction it seeks, FRP must show that it is *likely* to prevail on both those issues.

Let's start with the former. Under the APA, FRP purchased "all rights of a Selling Party under all Contracts … including all rights of Selling Parties under any non-competition, non-solicitation, non-piracy, or other restrictive covenant in favor of a Selling Party …." (APA § 2.01(c), at 10). And "Selling Party" includes Fifth Third

19

Insurance Agency, R.G. McGraw Insurance Agency, Inc.,[5] and Epic Insurance Solutions Agency LLC. (*Id.* at 1).

In light of the discussion above, the problem with that language should be immediately apparent. It is not at all clear that the restrictive covenant in the 2020 ICP runs "in favor of" Epic Agency or FTI (as opposed to "Fifth Third"). And, more fundamentally, even if it does, the promise to assign rights under the APA naturally can extend only to those rights that are assignable. On that front, as also noted above, given the language of the ICP, it is not at all clear that the category "assignable rights" includes the rights under the restrictive covenant (which are transferable only to a "successor in interest" or "purchaser of all or substantially all of Fifth Third's assets"). (2020 ICP, Pl. Hr'g Ex. 7, at 15).

Given that restrictive covenants are "strictly construed against enforcement," *see Avki*, 1993 WL 187923, at *2, and that any residual ambiguity is construed against the drafter (Fifth Third), the Court concludes that the ambiguity surrounding these questions precludes Defendants from establishing the requisite likelihood of success on the merits to warrant injunctive relief. And, because Defendants have failed in establishing their right to enforce the covenant as a threshold matter, the Court need not, and thus does not, consider whether the terms of the restrictive covenant meet *Raimonde*'s nine-factor test. (Of course, if this matter proceeds to a trial on the merits, not only will Defendants need to establish the validity of any

---

[5] No party has suggested that the McGraw entity is in any way relevant to the Court's decision in this matter. Accordingly, the Court does not discuss that entity further.

assignment, but they will also need to show that the covenant is enforceable under *Raimonde*.)

In short, for all of the above reasons, the Court concludes that Defendants have failed to show "a strong or substantial likelihood … of success on the merits," and thus have fallen short of carrying their burden on the first prong of the test for a preliminary injunction. *Bossert*, 579 F. Supp. at 66; *Warner*, 715 F.2d at 1123.

## B. The Remaining Prongs Do Not Strongly Favor Injunctive Relief.

Where the party seeking injunctive relief falls short on the first prong, there is at least some case law suggesting that "it is not necessary, strictly speaking, to address the remaining three parts of the test to conclude that [the movants] are not entitled to the preliminary relief they seek." *Bossert*, 579 F. Supp. at 66. But that may overstate the point. It is probably more accurate to say that "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales*, 225 F.3d at 625 (noting that a finding of no likelihood of success is "usually fatal" to a request for injunctive relief (citing *Mich. State AFL–CIO*, 103 F.3d at 1249)). Here, while the Court concludes that Defendants have not made the necessary showing on the first prong (i.e., that they have not shown a significant likelihood of success), the Court is unwilling to say that they have "*no* likelihood of success." Accordingly, the Court reviews the remaining prongs, but concludes that, on balance, they do not strongly favor injunctive relief here.

To establish the second prong, irreparable injury, the movant must show injuries that are not fully compensable in money damages. *Basicomputer Corp. v.*

21

*Scott*, 973 F.2d 507, 511 (6th Cir. 1992). Here, that is admittedly something of a close call. Of course, to the extent that Defendants ultimately prove that Ray is not entitled to solicit or accept business from the clients he served at Fifth Third, one measure of damages may be the revenues (or perhaps profits) that he generated from those clients. At the same time, that measure of damages may undervalue the harm that FRP incurs. After all, the point of the non-compete is to allow FRP an opportunity to establish a relationship with those clients without interference from Ray. And, if FRP succeeds in doing so, it presumably may generate profits from that relationship for multiple years to come. Thus, perhaps not surprisingly, "[t]he Sixth Circuit has found that the breach of a non-competition clause typically is likely to cause irreparable harm to an employer." *Ever-Seal, Inc. v. Halferty*, No. 3:22-CV-00082, 2022 WL 418692, at *8 (M.D. Tenn. Feb. 10, 2022) (citing *Basicomputer*, 973 F.2d at 512). And, particularly relevant here, one of the cases that the Sixth Circuit relied on for that proposition in *Basicomputer* was an Eighth Circuit case holding that irreparable harm can be inferred from an insurance sales representative's breach of a non-competition covenant. *See Basicomputer*, 973 F.2d at 512 (citing *Overholt Crop Ins. Serv. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991)). Thus, this prong cuts at least somewhat in favor of the requested preliminary injunctive relief here.

The third prong requires the Court to consider the potential impact on other parties, principally the non-moving party. *See, e.g.*, *Johnson v. Bobbitt*, No. CV 621-022, 2021 WL 1792125, at *4 (S.D. Ga. May 5, 2021) ("Plaintiff also completely fails to satisfy the third and fourth prongs regarding the threatened injury to him

22

outweighing whatever damage the proposed injunction may cause the opposing party and whether if issued, the injunction would be adverse to the public interest."); *Kohler v. City of Cincinnati*, No. 1:20-CV-889, 2021 WL 761630, at *13 (S.D. Ohio Feb. 27, 2021), *report and recommendation adopted,* No. 1:20-CV-889, 2021 WL 1558334 (S.D. Ohio Apr. 21, 2021) (noting that "[t]he third and fourth prongs of the preliminary injunction analysis" require "assessing the harm to the opposing party and weighing the public interest").

Here, the Court is cognizant that the covenant at issue does not prevent Ray from seeking to sell insurance *at all*, but rather only to clients that he serviced while employed as a Fifth Third subsidiary. At the same time, the evidence at the hearing tended to suggest that Ray's existing clients, many of whom apparently were clients of his even before he came to Fifth Third, let alone to FRP, were the principal source of income that he could expect from selling insurance in the short term. Accordingly, the Court concludes that Ray would be likely to suffer significant harm, including to his ability to support his family, if the Court were to enter the requested injunctive relief. Especially in light of Defendants' failure to establish a strong likelihood of success, the Court concludes that this factor counts against injunctive relief here. *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985) (noting that the preliminary injunction considerations are "factors to be balanced").

That leaves the public interest. The Court concludes that this prong does not count strongly in favor of, or against, preliminary injunctive relief. Of course, as a general matter, the public has an interest in contracts being performed according to

their terms. But, as noted above, what the contracts at issue here require is, at best, a bit of a mystery at this point. Moreover, to the extent that clients prefer to purchase their insurance from Ray, entering the requested relief would interfere with those preferences. So that cuts, at least to some extent, in the other direction. While that harm to third parties is inherent in the nature of a non-competition agreement, here, Defendants' failure to make the necessary showing as to the first prong means that those third parties ultimately may suffer that harm for no valid reason. Accordingly, the Court concludes that this prong does not change the calculus much in either direction.

In sum, the Court's analysis of the remaining three prongs fails to identify any basis for overcoming Defendants' failure to make the necessary showing on the first prong of the test for preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court concludes that Defendants have not met the heavy burden they must carry to warrant a preliminary injunction. Accordingly, the Court **DENIES** FRP's Motion for Preliminary Injunction (Doc. 37) and **VACATES** the previously entered Amended Agreed Temporary Restraining Order (Doc. 47). However, the Court **DIRECTS** the Clerk to **RETAIN** the $50,000 surety bond associated with the Amended Agreed Temporary Restraining Order (Doc. 47) pending further Order of the Court.

**SO ORDERED.**

March 31, 2022
**DATE**                                    **DOUGLAS R. COLE**
                                            **UNITED STATES DISTRICT JUDGE**